IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KENNETH SEGAL, ADAM SEGAL, as trustee for
and on behalf of THE KAREN AND KENNETH
SEGAL DESCENDANTS TRUST, and SEGAL AND
MOREL, INC.

                Plaintiffs,

      v.

STRAUSSER ENTERPRISES, INC.,
GARY STRAUSSER, and
LEONARD MELLON,

              Defendants.

CIVIL ACTION
NO. 07-4647

## MEMORANDUM

**SCHMEHL, J.  /s/ JLS**                                        **JUNE 12, 2019**

       This is a contract dispute between multiple parties involving the transfer and proposed development of several real estate lots in Forks Township, Pennsylvania.  Specifically, parcels of land were divided into three separate phases and agreements for construction of single-family homes, condominiums, and townhomes.  Plaintiffs bring these claims against Defendants for improperly filing a State Court Complaint and *Lis Pendens* in the Court of Common Pleas of Northampton County, which frustrated a proposed transaction between Plaintiffs and a third-party purchaser.  Plaintiffs bring four claims against Defendants: Tortious Interference with Contract (Count I); Tortious Interference with Prospective Contractual Relations (Count II); Dragonetti Act (Count III); and Abuse of Process (Count IV).  Defendants SEI and Mr. Mellon individually move for summary judgment arguing Plaintiffs' federal claims are precluded under collateral estoppel given the 2012 Redding Panel arbitration decision, and the claims fail as a matter of law.  For the reasons explained below, this Court will deny Defendant SEI and

Defendant Mr. Mellon's motions for summary judgment. We will first address Defendant SEI's collateral estoppel argument and then turn to the claims as a matter of law.

## I. <u>UNDISPUTED FACTS</u>

The parties stipulated to the below facts for use in connection with Defendants' motions for summary judgment. This matter has a complicated history and involves numerous parties. Plaintiffs in this action are: 1) Segal and Morel, Inc. ("S&M, Inc."), builders and developers; 2) Kenneth Segal, President of S&M, Inc.; and 3) Adam Segal, sole trustee of The Karen and Kenneth Segal Descendants Trust (the "Trust") (collectively "S&M"). (ECF Docket No. 395, ¶¶ 1-3.) Also, at the time of this dispute, Mr. Segal and the Trust were the sole members of the following limited liability companies: Segal and Morel at Forks Township II, LLC; Segal and Morel at Forks Township III, LLC; Segal and Morel at Forks Township IV, LLC; and Segal and Morel at Forks Township X, LLC f/k/a Segal and morel at Forks Township VII, LLC ("S&M LLC VII") (collectively the "S&M LLCs").

Defendants in this action are: 1) Strasser Enterprises, Inc., a corporation engaged in the business of home building and real estate/community development; 2) Gary Strausser, President of SEI (collectively with Strasser Enterprises, "SEI"); and 3) Leonard Mellon, attorney at law and duly licensed to practice in the Commonwealth of Pennsylvania.[1]  (Id. at ¶¶ 6-10.)  During this time, SEI built homes and developed a community known as the Riverview Estates ("Riverview") located in Forks Township, Pennsylvania. (Id. at ¶ 8.) Riverview is a multi-phase real estate development of single-family homes, condominiums, and townhomes, which includes a golf course and recreational center. (Id. at ¶ 9.)

---

[1] This Court will refer to Defendants collectively as SEI until we reach our analysis of Dragonetti Act claim for Mr. Mellon.

S&M, Inc. contracted to purchase from SEI multiple parcels of land located in Forks Township, Northampton County, Pennsylvania, at a collective cost of more than $15,000,000. (Id. at ¶ 12.) The parcels of land were divided into three separate phases and agreements for construction of single-family homes, condominiums, and townhomes. (Id. at ¶ 13.) The first agreement, dated July 5, 2001, provided for a total of 105 single family dwellings known as Phase I (consisting of a maximum of 76 subdivided single family residential lots) and Phase III (consisting of 29 subdivided single family residential lots). (Id. at ¶ 14.) The second agreement, dated June 11, 2002, provided for a maximum amount of 110 condominiums, a parcel designation for a community center, and one single family residential lot known as Phase II. (Id.) And the third agreement, dated April 25, 2003, provided for a maximum of 56 townhouse lots known as Phase III. (Id.)

The July 5, 2001 (Phase I), and April 25, 2003 (Phase III), agreements were amended three times through a series of documents known as: 1) Amendment to Agreements of Sale of July 5, 2001, and April 25, 2003 ("First Amendment"); 2) Second Amendment to Agreements of Sale of July 5, 2001, and April 25, 2003 ("Second Amendment"); and 3) Third Addendum to Agreements of Sale of July 5, 2001, and April 25, 2003 ("Third Addendum"). (Id. at ¶ 15.) Specifically, the Second Amendment included an agreement where SEI would sell additional lots in Riverview – known as Phase IV – to S&M, Inc. (Id. at ¶ 16.) The Third Addendum contained a binding arbitration provision. (Id. at ¶ 17.) And the First Amendment and Third Addendum contained clauses ratifying and confirming the July 5, 2001, Agreement, and April 25, 2003, Agreement. (Id. at ¶ 18.) More specifically, the arbitration provisions in the Third Addendum expanded the scope to encompass not only disputes "concerning the terms of the Purchase Agreements and earlier Amendments, but also all other 'disputes arising under or from [the

Third Addendum] or any previous Addendum or the Agreements of Sale between the parties.'"
(ECF Docket No. 1, ¶ 27.)

On September 7, 2001, SEI entered into an Agreement of Sale with Michael and Anthony Rinaldi to purchase about 125 acres of land located in Forks Township, Pennsylvania, known as the "Rinaldi Tract" or "Riverview West" (the "Rinaldi Agreement"). (ECF Docket No. No. 395, ¶ 19.) On February 28, 2003, SEI subsequently entered into an Assignment of the Rinaldi Agreement to S&M VII, LLC by contract which assigned SEI's rights and obligations under the Rinaldi Agreement to S&M VII, LLC. (Id. at ¶¶ 20-21.) Under the Rinaldi Agreement, SEI was to receive 25 acres of the approximate 125 total acres conveyed under the Rinaldi Assignment. (Id. at ¶ 22.) The Agreements mentioned above, along with the First Amendment, Second Amendment, Third Addendum, Rinaldi Agreement, and Rinaldi Assignment – collectively known as the "Purchase Agreements" – closed in multiple phases: December 5, 2001 (Phase I); March 7, 2003 (Riverview West); October 3, 2003 (Phase II); April 20, 2004 (Phase III Townhouses and Singles); and, February 17, 2005 (Phase IV). (Id. at ¶ 24.)

The current dispute between the parties arises out of the "Buy Back Option" language in the June 11, 2002 (Phase I), Agreement, and "Right of First Refusal" language in the April 25, 2003 (Phase III), Agreement. (Id. at ¶ 25.) First, the June 11, 2002, Agreement included a "Buy Back" provision under clause 5.17.4, which stated:

> Buyer acknowledges that Phase II is a four-year build out and agrees to aggressively market the purchased properties to homebuyers. Should Buyer be unable to market the properties successfully, absent any government imposed moratorium, building an average of 20 units per year over a four (4) year period, it hereby agrees to give Seller a right of first refusal to take back the approved and improved lots at the same price contained herein.
>
> This buy back option creates no obligation on Seller to re-purchase any lots, nor is it a guarantee of their marketability. This option is also not intended to have

priority over any mortgage interest in the property and Seller agrees to subordinate this option to any and all financing or Buyer.

(Id.) Second, the April 25, 2003, Agreement included a "Right of First Refusal" provision under clause 5.17.4, which stated:

> Should Buyer decide to sell all or some of the lots Buyer hereby agrees to give Seller a right of first refusal to take back the approved and improved lots.
>
> This buy back option creates no obligation on Seller to re-purchase any lots, nor is it a guarantee of their marketability. This option is also not intended to have priority over any mortgage interest in the property and Seller agrees to subordinate this option to any and all financing or Buyer.

(Id. at ¶ 28.) Prior to finalizing the language in the "Right of First Refusal" provision under clause 5.17.4 of the April 25, 2003, Agreement, the parties agreed to strike two phrases: 1) "be unable to market the properties successfully, absent any government imposed moratorium, building an average of 25 units per year"; and 2) "at the same price contained herein." (Id. at ¶ 26-27.)

Following execution of the Purchase Agreements, S&M, Inc. assigned "its rights, interests, and obligations under the Purchase Agreements to" certain limited liability companies, such as S&M LLC, whose sole members were Mr. Segal and the Trust. (Id. at ¶¶ 29-30.) Specifically, S&M states: "[S&M, Inc.] shall have the right to designate one or more of its subsidiaries or affiliate entities to acquire title to the Property hereunder." (ECF Docket No. 1, ¶ 15.) S&M, Inc. then assigned "all of its rights, interests and obligations under and pertaining to" the Purchase Agreements and the Amendments, to the S&M LLCs – affiliates of S&M, Inc. (Id. at ¶ 17.) Accordingly, all of S&M, Inc.'s rights were transferred to the S&M LLCs.

On December 21, 2005, Mr. Segal and the Trust entered into an Agreement of Sale with K. Hovnanian Pennsylvania Acquisitions, LLC ("KHOV"). (Id. at ¶ 31.) According to the contract, KHOV was acquiring "all Membership Interests in the LLCs, pursuant to the terms and

conditions of [the Hovnanian Agreement]" from Mr. Segal and the Trust. (Id. at ¶ 32.) The

Hovnanian Agreement defined "Membership Interest" as:

> [A]ll Assets defined herein, but shall not include any assumption of debts, claims, accounts payable, liabilities or obligations of Seller's of any kind or nature, whether accrued or unaccrued, absolute or contingent; and Seller shall, after Closing, remain responsible for all debts, claims or accounts payable, liabilities or obligations of Seller.

(Id. at ¶ 33.) The Hovnanian Agreement defined "Assets" as:

> [I]nclude[ing] but not limited to all real property, including all model homes, homes under construction, some of which are sold, some of which are speculative, signed agreements of sale for homes, inventories, work in progress, raw materials, office supplies and office equipment, vehicles, furniture, licenses, permits, approvals, goodwill, architectural plans, blue prints, trademarks, rights, title and interest in all of Seller's contracts, deposits, correspondence and sales files and escrow funds held by an entity in favor of the LLC. The Assets are listed on Exhibit C attached hereto. All Assets which are to remain with Seller or which will be transferred at an additional cost to Buyer are delineated on Exhibit C. Seller shall have the right to retain use of the plans for the single family homes. Buyer may not use such plans on another Buyer project; however, Buyer retains the right to use the multi family home plans on other projects, without restriction.

(Id. at ¶ 34.) The parties anticipated closing the Hovnanian Agreement on February 15, 2006, for

a total of $39,000,000. (Id. at ¶¶ 35-36.)

On February 3, 2006, Mr. Segal offered to sell Mr. Strausser and SEI 56 townhouse units

in Phase III – then owned by S&M III, LLC – for $74,000 per unit. (Id. at ¶¶ 37-38.) At the

time of this offer, Mr. Segal and the Trust signed the Hovnanian Agreement. (Id. at ¶ 39.) Mr.

Segal did not inform Mr. Strausser of the proposed KHOV deal when he offered to sell the

townhomes to Mr. Strausser. (Id. at ¶ 40.) On February 10, 2006, Mr. Strausser offered to pay

Mr. Segal $74,000 per unit and begin the title work to settle within 3-4 weeks. (Id. at ¶ 41.) The

following day, Mr. Strausser expressed his intent to exercise his "right of first refusal to purchase

the townhouse lots of Riverview Estate Phase III as per the Agreement of Sale executed in April

2003 Section 5.17 Sub-paragraph 4." (Id. at ¶ 42.) Although Mr. Stausser expressed his intent to exercise his right of first refusal, the 56 townhouse units were never conveyed. (Id. at ¶ 43.)

Ten days after the offer to Mr. Strausser, and because of the above, SEI filed both a Complaint in Equity ("State Court Complaint") against S&M, Inc. and S&M VII, LLC, and a Praecipe for *Lis Pendens* in the Court of Common Pleas of Northampton County. (Id. at ¶ 44-45.) The Northampton County Prothonotary entered a Notice of Entry of *Lis Pendens* for the following real estate parcels: 1) the Rinaldi Tract; 2) Phase II of Riverview Estates; 3) Phase III of Riverview Estates; and 4) Phase IV of Riverview Estates. (Id. at ¶ 47.)

SEI's State Court Complaint alleged four counts against S&M, Inc. and S&M VII, LLC. (Id. at ¶ 48.) Count I alleged: SEI complied with all conditions precedent in the Rinaldi Assignment to close on its 25 acre parcel; it notified S&M VII, LLC of its desire to close; and S&M VII, LLC had not yet agreed to a time and place for settlement. (Id. at ¶ 49.) Count I sought specific enforcement of the Assignment Agreement, enjoin S&M VII, LLC from selling the 25 acres to a third party, and order S&M, LLC VII to convey the 25 acre parcel to SEI. (Id. at 50.) Count II alleged: SEI intended to exercise its option to purchase back the lots that were subject to the June 11, 2002, Agreement, but that it could not do so because S&M, Inc. intended to sell the lots to a third party. (Id. at ¶ 51.) Count II sought to order S&M, Inc. convey the lots in Phase II to SEI. (Id. at ¶ 52.) Count III alleged: SEI intended to exercise its option to purchase back the lots that were subject to the April 25, 2003, Agreement, but could not do so because S&M, Inc. was in the process of selling the lots to a third party. (Id. at ¶ 53.) Count III sought to enjoin S&M, Inc. from selling the lots to a third party and instead order S&M, Inc. to convey the lots to SEI. (Id. at ¶ 54.) Count IV alleged: the Agreements of July 5, 2001, and April 25, 2003, provided SEI with a right of first refusal to buy back certain lots in the event

S&M, Inc. decided to sell the lots to a third party; SEI intended to exercise its option to purchase those lots, but S&M, Inc. refused to honor the option because it was in the process of selling the lots to a third party in violation of the Agreements.  (Id. at ¶¶ 55-56.)

S&M, Inc. and S&M VII, LLC moved to strike the *Lis Pendens* and dismiss SEI's State Court Complaint.  (Id. at ¶ 57.)  On February 28, 2006, in an Opinion discussed more fully below, Judge Paula A. Roscioli of the Court of Common Pleas of Northampton County granted S&M, Inc. and S&M VII, LLC petition to strike the *Lis Pendens* and dismiss SEI's State Court Complaint; Judge Roscioli directed the prothonotary to remove any indexed *Lis Pendens*.  (Id. at ¶ 58; ECF Docket No. 396-3, Ex. X., at 133-142.)  But the day before Judge Roscioli entered her Order and Opinion, KHOV terminated the Hovnanian Agreement alleging Segal and the Trust were in violation of the representations and warranties and the "time of the essence" clause in the Hovnanian Agreement.  (Id. at 59; ECF Docket No. 1, at ¶¶ 36-37.)  Following Judge Roscioli's Opinion striking the *Lis Pendens* and dismissing the State Court Complaint, SEI appealed the decision to the Pennsylvania Superior Court.  (Id. at ¶ 60.)  Judge Roscioli issued a Pa.R.A.P. 1925(a) Statement, and on October 20, 2006, the Superior Court affirmed Judge Roscioli's February 28, 2006, Opinion striking the *Lis Pendens* and dismissing the State Court Complaint. (Id. at ¶¶ 61-62.)

During the pendency of the appeal to the Superior Court, the parties continued to arbitration seeking determinations of various rights and obligations under the Purchase Agreements.  (Id. at ¶ 63.)  The first arbitration – the Walters Panel – consisted of a three-member panel chaired by Thomas Walters, Esquire.  The Walters Panel produced five awards between July 14, 2006, and December 19, 2008.  Specifically, the July 14, 2006, award stated:

> The transfer of membership interest, in whole or in part, by the L.L.C. assignees
> of Segal and Morel, Inc., as set forth in the afore referred to agreements will not

trigger, and are not subject to, the right of first refusal as set forth in the agreement of April 25, 2003, as amended.

(Id. at ¶ 66.)

On November 5, 2007, Mr. Segal, the Trust, and S&M, Inc., initiated this federal action against SEI, Mr. Strausser, and Mr. Mellon, alleging Tortious Interference with Contract, Tortious Interference with Prospective Contractual Relations, Malicious Prosecution under 42 Pa. C.S.A. § 8351, and Abuse of Process. (Id. at ¶¶ 67-70.) SEI filed a counterclaim against S&M alleging SEI exercised its option to reacquire the Phase II lots under Paragraph 5.17.4 of the June 11, 2002, Agreement. (Id. at ¶ 73.) SEI also counterclaimed that SEI accepted S&M's offer to sell certain lots in Phase III, and after that acceptance, S&M, Inc. refused to convey the plots of land to SEI given they were improperly included in the sale to KHOV. (Id. at ¶ 74.) By accepting the offer, SEI alleged it was at least the equitable owner of the lots in Phase III, meaning S&M, Inc. breached the April 25, 2003, Agreement by failing to honor SEI's exercise of the option. (Id. at ¶ 75.) S&M moved to dismiss the Counterclaim arguing the parties already submitted to binding arbitration. (Id. at ¶ 77.) SEI moved to stay its Counterclaim pending resolution of the claims at arbitration. (Id. at ¶ 78.) This Court stayed SEI's Counterclaim and the claims proceeded to arbitration. (Id. at ¶¶ 79-80.)

On May 6, 2010, SEI filed a Petition to Compel the Appointment of an Arbitrator to Serve as if Appointed by the Respondents in the Court of Common Pleas of Northampton County, identifying two claims against S&M, Inc., S&M II, LLC, and S&M III, LLC. (Id. at ¶ 81.) On October 17, 2011, SEI filed a complaint in arbitration against S&M, Inc. and Mr. Segal, which covered other entities not a party to this action, like S&M II, LLC, S&M III, LLC, and S&M IV, LLC. (Id. at ¶ 82.)

The second arbitration – the Redding Panel – chaired by Edward L. Redding, Esquire, issued its Order on October 23, 2012, finding in favor of SEI on all claims except for attorneys' fees. (Id. at ¶¶ 83-85.) Although the arbitration panel found in favor of SEI, the panel produced multiple documents – the Majority Order, Majority Opinion, and Dissenting Opinion – which required more litigation. (Id. at ¶ 84.) The parties litigated whether any of the Opinions constituted an "award" susceptible to confirmation by the Northampton County Court of Common Pleas. (Id. at ¶ 86.) On August 23, 2013, this Court stayed the present action so the parties could litigate the "meaning and effect" of the Redding Panel's 2012 Majority Order, Majority Opinion, and Dissenting Opinion. (Id. at ¶ 87.) On July 6, 2016, the Pennsylvania Superior Court affirmed the final judgment entered on the Redding Panel's arbitration award by the Court of Common Pleas; all appeals concluded when the Pennsylvania Supreme Court denied the Petition for Allowance of Appeal filed by S&M, Inc., S&M II, LLC, S&M III, LLC, S&M IV, LLC, and Mr. Segal. (Id. at ¶ 89.) On April 6, 2017, this Court lifted the stay and reassigned the matter to the undersigned.

## II.   STANDARD OF REVIEW

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go

beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party

"must present more than just bare assertions, conclusory allegations or suspicions to show the

existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)

(citation and internal quotation marks omitted). Summary judgment must be granted against a

non-moving party who fails to sufficiently "establish the existence of an essential element of its

case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d

247, 265 (3d Cir. 2014).

## III.   ANALYSIS

### 1.   Issue Preclusion is not Applicable to any of S&M's Claims.

Issue preclusion prevents parties from litigating the same issues after a court of

competent jurisdiction already adjudicated the issue on the merits, and entered a final judgment

as to those parties and their privies. *Witkowski v. Welch*, 173 F.3d 192, 198 (3d Cir. 1999)

(citing *Schroeder v. Acceleration Life Ins. Co.*, 972 F.2d 41, 45 (3d Cir. 1992)). This prevents

and precludes re-litigation of issues already litigated and necessary to the outcome of the first

action. *Disney Enterprises, Inc. v. Entertainment Theatre Group*, 2014 WL 5483487, at *3-4

(E.D. Pa. 2014). Issue preclusion requires three elements:

> (1) the identical issue was previously adjudicated; (2) the issue was actually
> litigated; (3) the previous determination was necessary to the decision; and (4) the
> party being precluded from relitigating the issue was fully represented in the prior
> action.

*Id.* at *4 (citing *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 247–48 (3d

Cir. 2010) (quoting *Szehinskyj v. Atty. Gen. of U.S.*, 432 F.3d 253, 255 (3d Cir. 2005)); *see also*

*PrecisionIR, Inc. v. Slawter*, 686 F.Supp.2d 540, 543 (E.D. Pa. 2010) (citing *Dici v.*

*Pennsylvania*, 91 F.3d 542, 548 (3d Cir. 1996)); *Bortz v. Workmen's Compensation Appeal Bd.*,

683 A.2d 259, 261 (Pa. 1996); *Safeguard Mut. Ins. Co. v. Williams*, 345 A.2d 664, 668 (Pa. 1975); *Shaffer v. Smith*, 673 A.2d 872, 874 (Pa. 1996); *Kelley v. TYK Refractories Co.*, 860 F.2d 1188, 1194 (3d Cir. 1988); *Bradley v. Pittsburgh Bd. Of Ed.*, 913 F.2d 1064, 1073 (3d Cir. 1990); *Gregory v. Chehi*, 843 F.2d 111, 121 (3d Cir. 1988); *Rider v. Commonwealth of Pennsylvania*, 850 F.2d 982, 989-90 (3d Cir. 1988), *cert. denied*, 488 U.S. 993, (1988). Our Court of Appeals expanded on these elements by "consider[ing] whether the party being precluded had a full and fair opportunity to litigate the issue in question in the prior action and whether the issue was determined by a final and valid judgment." *Disney*, 2014 WL 5483487 at *4 (citing *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006)).

Issue preclusion also applies to the arbitration process where a judgment is obtained. *Witkowski v. Welch*, 173 F.3d at 199. "Under Pennsylvania law, arbitration proceedings and their findings are considered final judgments for the purposes of [issue preclusion]." *Dyer v. Travelers*, 572 A.2d 762, 764 (Pa. Super. Ct. 1990) ("An arbitration award from which no appeal is taken has the effect of a final judgment on the merits."); *Ottaviano v. Southeastern Pennsylvania Trans. Auth.*, 361 A.2d 810, 814 (Pa. Super. Ct. 1976); Restatement (Second) of Judgments § 84 (1982) ("[A] valid and final award by arbitration has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court."); *Id.* § 13 ("[F]or purposes of issue preclusion ... 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect."). SEI argue the 2012 Redding Panel's decision is a final judgment of the court and should be given preclusive effect in this case.

For the reasons below, this Court concludes the issues between the Redding Panel's 2012 decision and this current action lack identity and were not previously litigated. Therefore, issue preclusion will not apply to any of S&M's claims.

            a.   *The issues decided by the Redding Panel lack identity with the issues Plaintiffs present in this action.*

The Redding Panel's 2012 Opinion does not satisfy the requirements of issue preclusion because the issues here, while tangentially related, are not identical. Under the Restatement (Second) of Judgments, courts consider four factors in determining whether issues are identical:

> (1) substantial overlap between the evidence or argument to be advanced in the two proceedings; (2) application of the same rule of law; (3) overlap in discovery and pretrial preparation; and (4) how closely related the claims are.

*PrecisionIR*, 686 F.Supp.2d at 543 (citing Restatement (Second) of Judgments § 27 cmt. c (1982)). When two issues involve different facts, issue preclusion will only apply if the factual differences "are of no legal significance whatever in resolving the issue presented." *Id.* (citing *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 172 (1984)).

In *PrecisionIR v. Slawter*, the Slawter defendants argued PrecisionIR's withdrawal of its Virginia Uniform Trade Secrets Act ("VUTSA") claim in a related case pending in the Southern District of New York – *PrecisionIR v. Clepper* – precluded PrecisionIR's similar VUTSA claim against defendants in *Slawter*. *Slawter,* 686 F.Supp.2d at 541. In *Clepper*, PrecisionIR asserted claims under Virginia law against defendants Brent Clepper and TalkPoint Communications that were similar in *Slawter*. *Id.* at 542. Count IV of the original complaint in *Clepper* alleged defendant Clepper and TalkPoint violated the VUTSA. *Id.* Specifically, PrecisionIR alleged defendant Clepper learned trade secrets while employed at PrecisionIR and later utilized those secrets as an employee at TalkPoint – a competitor to PrecisionIR. *Id.* Similarly, in *Slawter*, PrecisionIR alleged former employee Michael Slawter misappropriated its trade secrets. *Id.* But

in *Clepper*, PrecisionIR Amended its complaint withdrawing its VUTSA claim against defendant Clepper and TalkPoint. *Id.* As a result, defendants in *Slawter* moved to preclude plaintiff PrecisionIR from asserting the VUTSA claim given PrecisionIR's withdrawal of the VUTSA claim in *Clepper*. *Id.*

This Court in *Slawter* declined to give preclusive effect as the issues in *Clepper* were not identical to the issues in *Slawter*. *Id.* at 543. The evidence advanced to prove the VUTSA claim in each case, as this Court explained, would not significantly overlap as defendant Slawter and defendant Clapper had different roles at PrecisionIR. *Id.* The distinct nature of Slawter's and Clepper's work would have required PrecisionIR to present different evidence to prove VUTSA allegations in each case. *Id.* And that means, the court continued, the alleged methods of misappropriation were different in the two cases and declined to give preclusive effect to the issues. *Id.* at 543-44.

In *Disney Enterprises, Inc. v. Entertainment Theatre Group*, the parties argued whether SLMI was precluded from asserting ownership of Spider-Man given earlier decisions in other jurisdictions which concluded "SLMI cannot prove its ownership of the copyrights because it is barred from re-litigating that issue due to issue preclusion." *Disney*, 2014 WL 5483487 at *4. This Court agreed with other jurisdictions and gave preclusive effect to Judge Crotty and Judge Martinez's decision precluding SLMI's ownership assertion to Spider-Man. *Id.* The specific issue in *Disney* was whether "Judge Crotty's decision precludes SLMI's claim in this case, and that issue may be addressed by reference to the other decisions that have already relied on Judge Crotty's opinion, particularly Judge Martinez's decision." *Id.* In short, the issue was whether the preclusive effect of Judge Crotty's decision on SLMI's assertion of ownership was also preclusive in the *Disney* case. *Id.* This Court found all factors of issue preclusion present: 1) the

issues were identical because the issue of ownership of the copyrighted comic book characters based on the 1998 Agreement was decided against Disney in several prior cases; 2) the issue was actually litigated as the briefing on Disney's motion to dismiss addressed issues relating to SLMI's inability to prove ownership of the copyrights because it was barred from re-litigating the issue due to issue preclusion; 3) the issue was necessary to the decision as Judge Martinez addressed only personal jurisdiction and issue preclusion and dismissed based upon issue preclusion; and 4) SLMI was fully represented in the action decided by Judge Martinez because SLMI itself was the plaintiff in that case. *Id.* at 4-5.

Here, SEI argues issue preclusion applies to S&M's claims because the Redding Panel already decided the issues raised in S&M's Complaint. First, SEI argues issue preclusion applies to the Dragonetti Act claim following the Redding Panel's final award granting SEI a legitimate buyback option and right of first refusal. (ECF Docket No. 394-2, at 12.) SEI claims S&M cannot now prove SEI lacked probable cause to file the State Court Complaint and *Lis Pendens* – one element under the Dragonetti Act – given the Redding Panel's final award. Second, SEI argues issue preclusion applies to S&M's abuse of process claim because SEI possessed a legitimate basis and probable cause to file the State Court Complaint and *Lis Pendens* given the Redding Panel's final award. (Id. at 16.) And finally, SEI argues issue preclusion applies to S&M's claims of tortious interference because SEI acted to protect some legitimate interest – its buyback option/right of first refusal – following the Redding Panel's final award. (Id. at 22-23.) Essentially, SEI argues S&M is precluded from bringing any claims because the Redding Panel's award effectively permitted SEI to file the State Court Complaint and *Lis Pendens* six years after S&M's Complaint was filed in this Court.

Before the Redding Panel's 2012 award, as we previously explained, SEI filed a State Court Complaint and *Lis Pendens* in 2006 to enforce its rights in the Northampton County Court of Common Pleas. But, the state court refused to address the merits of SEI's complaint and *Lis Pendens* and the court dismissed the action due to the parties' enforceable binding arbitration agreement. (ECF Docket No. 396-3, at 133-134.) Specifically, the court noted that neither party requested the court direct the parties to submit the dispute to arbitration, as no party disputed they were subject to binding arbitration, and therefore found it unnecessary to direct the parties. (Id.)

The court highlighted SEI's request to stay the complaint and continue the equitable protection of the *Lis Pendens* pending the resolution of the dispute through arbitration. (Id. at 134.) More specifically, the state court dismissed SEI's complaint and struck the *Lis Pendens* stating: "By its own admission, [SEI's] complaint is inappropriate. This admission undermines the notion that [SEI] has pursued its complaint in good faith, and in the Court's opinion, tips any balance of the equities against it." (ECF Docket No. 1-20, at 9.) Regarding the *Lis Pendens*, the court continued: "Plaintiff has used the *lis pendens* mechanism as a procedural weapon, and this is inappropriate"; the court refused to extend the *Lis Pendens* to the subject properties. (Id. at 10.) The court determined, "Plaintiff filed its Complaint in order to secure a *lis pendens* attached to the properties at issue in its dispute . . . the practical effect of a recorded *lis pendens* is to render a defendant's property unmarketable." (Id.) Following the state court's determination that SEI's complaint and *Lis Pendens* were inappropriate and pursued in bad faith, the Superior Court affirmed the state court's decision. (ECF Docket No. 396-3, at 141.) Six years after the state court's decision and Superior Court appeal, the Redding Panel recognized SEI's legitimate

buyback rights/options in relation to Phase II and Phase III of the Purchase Agreements. (ECF Docket No. 396-4, 19-71.)

The issues litigated by the Redding Panel focused on whether KHOV agreement constituted a sale of assets or membership interest and whether SEI's rights were triggered by the sale. (ECF Docket No. 396-4, at 26.) Specifically, the Redding Panel's opinion calculated damages for a breach of Phase II and Phase III buybacks, and whether the KHOV agreement was a sale of assets or membership interest. (Id.) First, the Redding Panel concluded the Phase II buyback was an option and not a right of first refusal which did not require a third-party offer to trigger buyback rights. The Redding Panel analyzed the language in the Phase II and Phase III Purchase Agreements and determined Phase II consisted of a buyback option because:

> The description of the buyback right as an "option," the failure to include any mechanism for notification of either the offer or the exercise of the right of first refusal, and the fact that SEI had the right to require the lots for a strike price as opposed to a match, all point to the conclusion: that the Phase II Buyback was intended as an option and not a right of first refusal.

(Id. at 11.) Second, the Redding Panel concluded the agreement between KHOV and S&M was a sale of assets which triggered SEI's buyback rights under Phase III. (ECF Docket No. 394-2, at 3-4.) The panel analyzed the language in the KHOV Agreement and concluded it was a sale of lots given how "Membership Interests" is defined to include only the assets. (Id. at 20.) The panel also concluded the agreement was a sale of assets because the title in the agreement contained "sale of all . . . assets of the" LLC's, and because of the way KHOV was taking title at closing. (Id. at 20-21.)

Although the Redding Panel determined SEI had legitimate buyback rights, S&M does not dispute the legitimacy of the Redding Panel's decision; instead, S&M argues SEI weaponized the legal proceedings by improperly filing the State Court Complaint and *Lis*

*Pendens* and purposefully interferred with the KHOV transaction. (ECF Docket No. 400, at 2.) S&M's Complaint alleges the parties agreed "that they (as well as their assigns) would litigate all disputes arising between them by virtue of the Purchase Agreements, as amended, by binding arbitration." (ECF Docket No. 1, ¶ 28.) S&M also contends:

> SEI was aware of the impending transaction and desperately wanted to stop it, hoping that doing so would garner leverage from which to secure monetary concessions from the Segal Sellers. SEI and Strausser, along with Mellon, their long-time counsel, hatched a baseless, spiteful and malicious plan to derail the transaction by filing a frivolous lawsuit mentioned below. Despite knowing that the Purchase Agreements, as amended, mandated that all disputes between SEI and S&M, Inc. (or their assigns) arising under such Agreements be adjudicated by binding arbitration, SEI instituted suit on February 13, 2006 in the Court of Common Pleas for Northampton County against S&M, Inc. and one of the S&M LLCs, Segal and Morel at Forks Township VII, LLC.

(Id. at ¶¶ 42-43.) Although S&M's Complaint alleges SEI lacked a buyback options or right of first refusal, the gravamen of S&M's claims arises out of SEI's improper use of the legal proceedings to interfere with the KHOV deal. The Complaint focuses on SEI's Phase II and Phase III rights primarily as they relate to the State Court Complaint and *Lis Pendens*. (ECF Docket No. 1; ECF Docket No. 396-3; ECF Docket No. 400, at 2.)

The factual differences between the Redding Panel arbitration and the instant case, like those in *PrecisionIR*, are of legal significance in resolving the issues presented. The issues before this Court lack an application of the same rule of law, lack overlap in discovery and pretrial preparation, and are not closely related. The issues SEI is trying to preclude – whether SEI had probable cause and a legitimate interest to file the *Lis Pendens* and State Court Complaint – were not litigated by the Redding Panel. In fact, the Redding Panel never made a factual determination that SEI had probable cause or a legitimate interest to file its 2006 Northampton County action; the Redding Panel merely determined SEI had legitimate buyback rights in Phase II and Phase III. (ECF Docket No. 396-4.) The Redding Panel never addressed

the legitimacy of SEI's State Court Complaint and *Lis Pendens*. (ECF Docket No. 396-4.) S&M filed its Complaint in response to SEI's improper State Court filing and *Lis Pendens* and not in response to the Redding Panel's award granting SEI legitimate buyback and first refusal rights; rights that no court of competent jurisdiction recognized until six years after S&M's Complaint in this Court.

Even if this Court were to accept SEI's argument that the 2012 Redding Panel's decision retroactively created probable cause and a legitimate interest, the issues would still lack identity as the Dragonetti Act, Abuse of Process, and Tortious Interference claims require more than a showing of probable cause and legitimate interest. And although a showing of probable cause may be considered a complete defense to a Dragonetti Act claim – usually a question of law for the court – the existence of probable cause "may be submitted to the jury when facts material to the issue of probable cause are in controversy." *Gigli v. Palisades Collection, L.L.C.*, 2008 WL 3853295, at *13 (M.D. Pa. 2008) (citing *Broadwater v. Sentner*, 725 A.2d 779, 782 (Pa. Super. Ct. 1999); *see also McKibben v. Schmotzer*, 700 A.2d 484, 492-93 (Pa. Super. Ct. 1997) (quoting *Kelley v. Gen. Teamsters, Chauffeurs & Helpers, Local Union 249*, 544 A.2d 940, 941 (Pa. 1988))). Likewise, this case certainly lacks an overlap in discovery from the 2012 Redding Panel as different evidence would need to be presented and different witnesses would need to be deposed and examined. Given all these factors and issues, this Court will not give preclusive effect to S&M's claims as the claims should be submitted to the jury.

### b. *The parties did not waive their right to arbitration.*

SEI claims the parties waived their binding arbitration agreement when SEI filed his State Court Complaint and *Lis Pendens*. Citing *Goral v. Fox Ridge, Inc.*, SEI claims "the existence of an arbitration clause clearly does not preclude the filing of a lawsuit. Indeed,

arbitration clauses are waivable," and therefore filing a claim on a contract with an arbitration clause is not a Dragonetti claim. (ECF Docket No. 402, at 7) (citing *Goral v. Fox Ridge, Inc.*, 683 A.2d 931, 933 (Pa. Super. Ct. 1996)). Under Pennsylvania law, a waiver of the right to proceed in arbitration may be explicitly stated or may be inferred from "a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary." *Keystone Technology Group, Inc. v. Kerr Group, Inc.*, 824 A.2d 1223, 1226 (Pa. Super. Ct. 2003) (citing *Goral*, 683 A.2d at 933). But, as the court in *Keystone* stated: "the mere filing of a complaint or an answer without resulting prejudice to the objecting party will not justify a finding of waiver of the right to arbitration." *Id.* (citing *Kwalick v. Bosacco*, 329 Pa.Super. 235, 238, 478 A.2d 50, 52 (1984)).

*Goral* is distinguishable because the appellants in *Goral* sought relief from the trial court and failed to obtain a favorable ruling; only then did the appellants seek arbitration as an alternative forum. *Goral*, 683 A.2d 934. *Keystone* also differs because plaintiff sought to arbitrate a few weeks after filing the complaint. *Keystone*, 824 A.2d at 1226. In *Keystone*, the court concluded the plaintiff did not waive the right to arbitrate given the lack of discovery conducted and the defendant's failure to argue they suffered prejudice or that plaintiff gained an unfair advantage. *Id.* at 1227.

Here, SEI and S&M agreed beforehand – and the state court agreed – the dispute was subject to binding arbitration; however, SEI bypassed the binding arbitration in favor of the courts while knowing of the binding arbitration agreement. The state court refused to address the merits of the dispute given the agreement between all parties to resolve any disputes via binding arbitration. SEI's did not waive its right to arbitrate by filing the State Court Complaint and *Lis*

*Pendens* and was subject to the arbitration agreement with S&M. Again, SEI appears to be using the courts as a procedural weapon against S&M and its federal claims.

Accordingly, this Court does not find the parties waived their right to binding arbitration following SEI's State Court filing and *Lis Pendens*.

    2.  <u>Genuine Issues of Material Fact Exist for Claims Against SEI.</u>

      *a. Dragonetti Act claim (Count III)*[2]

The gist of S&M's Dragonetti Act claim is that SEI and Mr. Mellon were grossly negligent and lacked probable cause when they filed and maintained the state court action and *Lis Pendens* given the existence of the binding arbitration agreement. (ECF Docket No. 1, ¶¶121-125.) According to S&M, the parties entered into an agreement to participate in binding arbitration for any and all disputes over the property development. (Id. at ¶123.)

Under the Dragonetti Act, liability may be imposed for wrongful use of civil proceedings if:

> (1) [they] act[ ] in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and
> (2) The proceedings have terminated in favor of the person against whom they are brought.

42 Pa.C.S. § 8351(a). A claim for Dragonetti Act requires: (1) the Dragonetti defendant procured, initiated or continued the civil proceedings against the other party; (2) the proceedings were terminated in favor of the person against whom they are brought; (3) the Dragonetti defendant did not have probable cause; (4) the primary purpose for which the proceedings were brought was not that of securing proper discovery, joiner of parties or adjudication of the claim on which the proceedings were based; and (5) the Dragonetti plaintiff suffered damages as set forth in 42 Pa.C.S. § 8353. *Adams v. Wells Fargo Bank, N.A.*, 2017 WL 1355421, at *2 (E.D.

---

[2] This Court will address the claims in the order presented in Defendants' brief.

Pa. 2017); *see also Villani v. Seibert*, 159 A.3d 478, 491 (Pa. 2017). This Court also recognizes the Dragonetti plaintiff must show the Dragonetti defendant filed the underlying action with both a lack of probable cause and for an improper purpose. *Id.*; *see also Broadwater v. Sentner*, 725 A.2d 779, 784 (Pa. Super. Ct. 1999).

This Court will first address S&M's claim for Dragonetti Act violations individually against Mr. Mellon, then address the claim for Dragonetti Act violations against SEI.

### i. *Leonard Mellon, Esq.*

Mr. Mellon claims he cannot be held liable under the Dragonetti Act because the legal position, although not upheld by the lower court, was based on probable cause and supported by appropriate case law. (ECF Docket No. 397, at 9.) Under the Dragonetti Act, an individual has probable cause in pursuing the underlying action if they "believe[ ] in the existence of the facts upon which the claim is based" and also:

> (1) reasonably believes that under those facts the claim may be valid under the existing or developing law; ... or
> (3) believes as an attorney of record, in good faith that his procurement, initiation or continuation of a civil cause is not intended to merely harass or maliciously injure the opposite party.

42 Pa.C.S. § 8352.[3] Under the Dragonetti Act, Courts should assess attorneys objectively. *Bannar v. Miller*, 701 A.2d 232, 238 (Pa. Super. Ct. 1997). Attorneys who initiate civil proceedings on behalf of their client without probable cause, this Court explained, will not be liable "if [they] act[ ] primarily for the purpose of aiding [their] client in obtaining a proper adjudication of [their] claim." *Schmidt v. Currie*, 470 F.Supp.2d 477, 480 (E.D. Pa. 2005) (citing *Gentzler v. Atlee*, 660 A.2d 1378, 1382 n.6 (1995)). But, where an underlying action is filed or maintained without justification, the court may infer an improper purpose. *Id.* (citing *Broadwater v. Sentner*, 725 A.2d 779, 784 (Pa. Super. Ct. 1999). Pennsylvania courts explain:

---

[3] The second factor, omitted here, applies only to non-attorneys.

> [a]n attorney is not required or expected to prejudge [their] client's claim, and although [they are] fully aware that its chances of success are comparatively slight, it is [their] responsibility to present it to the court for adjudication if [their] client so insists after [they have] explained to the client the nature of the chances.

*Id.* at 481 (citing *Broadwater*, 725 A.2d at 784). But where an attorney knowingly prosecutes a groundless action for a malicious purpose, the attorney would be liable under the Dragonetti Act.

In *Schmidt*, the issue was whether the plaintiff's patient's attorney violated the Dragonetti Act by pursuing a state-court medical malpractice action against the plaintiff when the plaintiff prevailed. *Id.* at 482. This Court compared a Dragonetti action against an attorney to a legal malpractice action which requires analysis of an attorney's standard of care under the Dragonetti Act. *Id.* This Court in *Schmidt* found that the standard of care in a professional malpractice case is a question of fact for the jury which requires the use of expert evidence to rebut summary judgment. Id. at 482-483; *see also Gans v. Mundy*, 762 F.2d 338 (3d Cir. 1985) (applying the requirement of expert evidence to a motion for summary judgment). Citing Our Court of Appeals in *Gans*, this Court in *Schmidt* shifted the burden from the moving party to the non-moving party once the moving party averred facts and alleged they were not negligent. This Court explained, "a plaintiff who fails to produce expert evidence cannot meet [their] burden of proof." *Id.* at 483 (citing *Gans*, 762 F.2d at 343). The plaintiff in *Schmidt* did not produce an expert to establish evidence the defendants failed to meet the standard of care required for attorneys under the Dragonetti Act. *Id.* Given how the standard of care is a question of fact for the jury, "no jury could possibly assess whether the chances of success of the underlying action rose to the level of 'comparatively slight' without expert testimony." *Id.* at 484.

Mr. Mellon argues no improper purpose exists for "simply thwarting the sale to KHOV" by indexing the *Lis Pendens* as the *Lis Pendens* is an equitable device that "does not establish an actual lien on the affected property but merely give[s] notice to third parties that the real estate is

subject to litigation." (ECF Docket No. 397, at 11) (citing *Michael v. GLD Foremost Holdings, LLC*, 156 A.3d 318, 322 (Pa. Super Ct. 2017). Mr. Mellon and Mr. Strausser testified at deposition the "purpose of indexing the *lis pendens* in the original injunction suit in Northampton County was, indeed, in perfect accord with its proper legal purpose of giving due notice of a dispute in litigation over property rights." (Id. at 11 n.2.) Mr. Mellon argues the urgent need to take immediate action to protect his clients' interest established both his probable cause and lack of gross negligence. (Id.) But, Mr. Mellon also argues whether he prevailed on SEI's behalf in the suit for injunctive relief before the lower court is "immaterial" for this Court's determination of whether he possessed probable cause or acted for an improper purpose. (Id. at 12.)

Unlike *Schmidt*, where the non-moving party failed to create a dispute of material fact regarding the standard of care to withstand summary judgment, S&M has created a genuine dispute regarding the standard of care required for attorneys under the Dragonetti Act. S&M submitted the testimony of an expert – Honorable Timothy K. Lewis[4] – who carefully and thoroughly explained the standard of care, and concluded that Mr. Mellon did not meet this standard of care. "Indeed, his own sworn testimony makes abundantly clear that he was fully aware of the contract requirement to proceed in arbitration." (ECF Docket No. 399-12, Ex. 12, at 36.) Judge Lewis opines, "no representative of Strausser Enterprises thoroughly reviewed, investigated, or understood the allegations in the complaint before they filed it and the *lis pendens*." (Id. at 2.)

Like *Schmidt*, where this Court shifted the burden on the non-moving party (plaintiff) to oppose the factual averments with expert evidence that the moving (defendant) party's conduct

---

[4] The Honorable Timothy K. Lewis currently serves as Co-Chair of the ADR Practice Group and the former Co-Chair of the Appellate Practice Group at Schnader Harrison Segal & Lewis, where he also serves as a mediator, arbitrator, settlement counselor, and appellate practitioner. Before moving to private practice, Judge Lewis served on the United States Court of Appeals for the Third Circuit and as a United States District Court Judge. (ECF Docket No. 399-12, Ex. B., at 49.)

failed to meet the appropriate standard of care, the burden shifts on Mr. Mellon to provide evidence his conduct met the appropriate standard of care. As Mr. Mellon did not respond by providing expert testimony, Mr. Mellon cannot prevail against S&M at this stage in the litigation because S&M has succeeded in creating a dispute of material fact.

This Court will deny Mr. Mellon's summary judgment. We continue our analysis of the SEI Defendants below.

ii. _SEI Defendants_[5]

SEI argues it had probable cause to file the state court action and index the _Lis Pendens_ to secure its rights over the property. (ECF Docket No. 394-2, at 13-14.) As this Court noted above, an individual has probable cause in pursuing the underlying action if they "believe[ ] in the existence of the facts upon which the claim is based" and also:

> (1) reasonably believes that under those facts the claim may be valid under the existing or developing law; [or]
> (2) believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge and information;

42 Pa.C.S. § 8352.[6]

SEI maintains it possessed the right to file a state court action and _Lis Pendens_ in 2006 given the Redding Panel's 2012 decision. (ECF Docket No. 394-2, at 13-14.) SEI alleges S&M failed to meet the second element of the Dragonetti Act because the underlying proceeding – the binding arbitration – was terminated in SEI's favor. (Id. at 14.) SEI argues that although the 2006 Northampton County Action was "arguably adjudicated" in S&M's favor, SEI succeeded before the Redding Panel and therefore the proceedings were terminated in SEI's favor. (Id.)

---

[5] SEI in this subsection, and only this subsection, refers to Strausser Enterprises and Mr. Strausser, not Mr. Mellon.
[6] The second factor, included here, was omitted from our analysis of Mr. Mellon as it only applies to non-attorneys. The third factor, omitted here, applies only to attorneys.

Likewise, SEI claims it merely relied on the advice and consent of its counsel and therefore cannot be held liable for Dragonetti Act violations. (Id. at 25-26.)

S&M disputes SEI's claims and argues SEI filed its state court action and *Lis Pendens* for an improper purpose, creating a violation of the Dragonetti Act given the lack of probable cause. Specifically, S&M states: "the Strausser Defendants knowingly and deliberately breached their duty to arbitrate because they believed a court filing would be more likely to affect the KHOV transaction." Salvatore J. Panto, Jr., SEI's Chief Administrative Officer, testified Mr. Mellon expressed to him the need to stop the closing, specifically stating Mr. Mellon conveyed the following: "the arbitration allowed would take too long, it wouldn't put the buyer on notice because the arbitration hearing couldn't be set up for at least a week or more. And then that he researched the best way to put the buyer on notice is through a *lis pendens*." (ECF Docket No. 399-6, Ex. 6, Panto Dep. At 145:13-17.)

The import of the parties' strategy, opined Judge Lewis, "was the obvious ramifications filing the complaint and *lis pendens* would have on any potential transaction by Mr. Segal, the Trust, and Segal and Morel." (ECF Docket No. 399-12, Ex. 12, at 2.) Judge Lewis continued:

> Mr. Strausser, Strausser Enterprises, and its counsel knew that their actions would encumber property and, in all likelihood, cause the pending transaction with K. Hovnanian to fall through. After their trial-level filings were dismissed, Mr. Strausser approved filing an appeal after learning Mr. Mellon's advice that an appeal would 'keep a cloud on the title' longer, even though Mr. Mellon had also made it clear that they would likely lose the appeal. Mr. Panto explained that the appeal 'would bring the buyer to Strausser, not just to Segal, just like it did with K. Hovnanian.' Thus, the clear purpose of pursuing the appeal was to further Strausser Enterprises' goals of payment for open items and luring potential buyers to it.

(Id. at 38-39.) Given SEI's use of the court system to secure monetary payment "that was not tethered to the title to land (as they had alleged)," Judge Lewis concluded SEI and Mr. Mellon acted for an improper purpose in filing the state court action and indexing the *Lis Pendens*. The

state court also determined SEI used the *Lis Pendens* as a procedural weapon, and found it inappropriate and not filed in good faith. (ECF Docket No. 400, Ex. X. Apr. 26, 2006 Opinion at 6.)

As there are genuine issues of material fact as to whether probable cause existed and whether the State Court Complaint and *Lis Pendens* were filed for an improper purpose, S&M's Dragonetti Act claim against SEI will remain.

### b. Abuse of Process claim (Count IV)

SEI contends S&M's abuse of process claim fails as a matter of law because it filed the State Court Complaint and *Lis Pendens* primarily to protect its property interests. (ECF Docket No. 394-2, at 17.) Under Pennsylvania law, abuse of process requires three elements: (1) the party used a legal process against the plaintiff; (2) primarily to accomplish a purpose for which the process was not designed; and (3) caused harm to the plaintiff. *ManorCare of Easton PA LLC v. Estate of Nagy*, 2017 WL 4347624, at *8 (E.D. Pa. 2017). We again are unpersuaded and find genuine issues of material fact remain.

Mr. Strausser and SEI's counsel, Mr. Mellon, testified: "that the purpose of the filing of the *Lis Pendens* and Complaint was consistent with the legally recognized purpose of a *Lis Pendens*, i.e. to put third party buyers on notice that there was a dispute as to property rights." (Id.) Mr. Mellon testified he filed the State Court Complaint and *Lis Pendens* primarily to "put any third party purchaser on notice of what Mr. Strausser's rights were, and that they would be taking the property subject to those rights." (ECF Docket No. 396, ¶ 33; ECF Docket No. 396-2, Ex. I, 134:21-135:22; ECF Docket No. 394-2, at 18.) Mr. Mellon also testified Mr. Strausser never expressed any "ill motive" in trying to enforce his legal rights. (Id.) Mr. Strausser testified he only filed the state court action and *Lis Pendens* to secure and protect his property

rights in the agreements which he claimed were not being honored. (ECF Docket No. 396, Ex. T, 746:22-747:15.) SEI maintains it did not file the state court action and *Lis Pendens* to accomplish a purpose for which the process was not designed.

S&M disagrees with SEI's argument that SEI solely intended to enforce its legal rights. SEI admits to filing the State Court Complaint and *Lis Pendens* to disturb the KHOV transaction. Specifically, e-mail communication from Mr. Strausser to Mr. Panto states: "[S]omething has to be filed PRIOR to the Havanian [sic] sale so we get paid for ALL open items." (ECF Docket No. 399, Ex. 5, E-mail from G. Strausser to S. Panto (Feb. 9, 2006, 6:18 p.m. EST.) Mr. Strausser testified he told KHOV that S&M owed him money and "[he] wanted to get paid." (ECF Docket No. 399, Ex. 3, 505:11-22.) According to S&M, Mr. Panto sent an e-mail to Mr. Strausser which stated:

> Len Mellon asked if you want to appeal the lis pendence [sic] ruling. The only advantage Len said is that it would keep a cloud on the title because the arbitration will be done by the time it gets to the superior court but he doesn't think we would win."

(ECF Docket No. 400, at 30) (citing 399-11, Ex. 11, Mar. 21-22, 2006, E-mail Exchange between S. Panto and G. Strausser.) The only advantage of filing the appeal on the state court action and *Lis Pendens* would be to place a "cloud on the title," not to succeed on the merits. It appears SEI and Mr. Mellon filed and appealed the state court action to "accomplish a purpose for which the process was not designed," which is required under abuse of process.

S&M's argument is further bolstered by Judge Paula A. Roscioli's 2006 Opinion: "Plaintiff has used the *lis pendens* mechanism as a procedural weapon, and this is inappropriate." (ECF Docket No. 396-3, Ex. X., at 141.) Judge Roscioli continued: "By its own admission, [SEI's] Complaint is inappropriate. This admission undermines the notion that Plaintiff has

pursued its Complaint in good faith, and in the Court's opinion, tips any balance of the equities against it." (Id.)

As S&M has created a genuine issue of material fact, S&M's claim for abuse of process will remain.

>    c. *Tortious Interference with Contract and Prospective Contractual Relations (Counts I and II)*

SEI argues it should not be held liable under tortious interference with contract and prospective contractual relations given the absence of any purposeful action to harm existing relations. (ECF Docket No. 394-2, at 20-21.) To prove tortious interference with contract or prospective contractual relations under Pennsylvania law, four elements must be met: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. *Lehigh Riverport Realty, L.P. v. Unity Bank*, 2016 WL 3213357, at *2 (E.D. Pa. 2016).

The second and third elements are intertwined and require a showing the defendant acted intentionally to harm the plaintiff and that those actions were improper. *Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 934 (Pa. Super. Ct. 2013). In determining improper conduct, the courts look to the factors of the Restatement (Second) of Torts Section 767:

> (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or

remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

*Id.* (citing Restatement (Second) of Torts § 767). Showing both harm and improper conduct is required because some intentionally harmful conduct is done "at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff." *Id.* (citing *Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008)). Comment b to section 767 also states:

> The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This Section states the important factors to be weighed against each other and balanced in arriving at a judgment; but it does not exhaust the list of possible factors.

*Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008) (citing Restatement (Second) of Torts § 767 cmt. b (1979)). In evaluating the above factors, the central inquiry is whether the defendant's conduct is "sanctioned by the 'rules of the game' which society has adopted." *Empire Trucking Co., Inc.*, 71 A.3d at 934; *see also Triffin v. Janssen*, 626 A.2d 571, 575 (Pa. Super. Ct. 1993) (holding refusal to consent to withdrawal of opposing party's attorney was not improper because conduct was consistent with the rules of court); *Small v. Juniata College*, 682 A.2d 350, 354 (Pa. Super Ct. 1996) (finding players on football team did not act improperly by voicing negative opinions of coach to college administration, which, upon investigation, discharged him, since in the academic world students are encouraged to voice their opinions).

SEI argues it was merely protecting its legitimate interests when it filed the State Court Complaint and *Lis Pendens*. Specifically, according to SEI, the 2012 Redding Panel further legitimized those rights precluding SEI from liability for tortious interference with contract and prospective contractual relations. (ECF Docket No. 394-2, at 22-24.) SEI continuously cites the 2012 Redding Panel decision as the basis for S&M's claims now failing as a matter of law. (Id.

at 23.) But, S&M argues and the lower court agreed, the parties submitted to binding arbitration for any dispute arising out of the original land deal between the two parties. (ECF Docket No. 400, at 23-24.) It certainly appears SEI initiated the state court action and *Lis Pendens* to prevent the KHOV from being finalized. (Id. at 24, n.13.) As S&M provides, Mr. Strausser sent an e-mail to Mr. Panto six days before the KHOV closing, stating: "If we do a[n] arbitration, it will not get filed against the property for their title insurance to pick up to the new buyers." (ECF Docket No. 400, at 24) (citing ECF Docket No. 399-5, Ex. 5, e-mail from G. Strausser to S. Panto (Feb. 9, 2006, 6:18 p.m. EST.)

Whether SEI's conduct was improper is a factual inquiry and credibility determination best reserved for a jury. As this Court cannot make a determination given the issues of material fact regarding S&M's tortious interference claims, this Court declines to dismiss this claim. At this stage in the proceedings, this Court cannot allow SEI to circumvent its contractual obligations and use the court system as a procedural weapon to enforce its rights. As we have discussed, SEI and S&M contemplated this exact situation and agreed to subject themselves to binding arbitration.

As there is a genuine issue of material fact regarding SEI's conduct, S&M's tortious interference claims will remain.

3.  <u>SEI is not Entitled to Summary Judgment Against S&M for Relying on the Advice of its Counsel.</u>

SEI argues it is entitled to summary judgment on the Dragonetti Act and Abuse of Process claims because it reasonably relied on the advice of its counsel, Mr. Mellon. SEI advances this defense to establish probable cause and negate malice. *Ciolli v. Iravani*, 625 F. Supp. 2d 276 (E.D. Pa. 2009). SEI's reliance, however, is misguided. In *Bannar v. Miller*, the Superior Court of Pennsylvania stated: "Mere claims of reliance on one's lawyer does not

31

insulate one from liability for an unfounded lawsuit." *Bannar v. Miller*, 701 A.2d 232, 238 (Pa. Super. Ct. 1997). Nothing in the record, the court continued, supported the suggestion that the defendant's reliance on the attorney would insulate him from determining whether he had probable cause to bring the suit. *Id.* "The decade of litigation shows appellant was no neophyte, swept away by an overzealous counsel." *Id.* We agree with the analysis in *Bannar* and find nothing in the record that would suggest the SEI Defendants were swept away by Mr. Mellon's years of "overzealous representation." SEI's involvement in its litigation strategy actually reveals the opposite. Because of this, this Court will not grant summary judgment.

4. <u>SEI is not Entitled to Summary Judgment on the Issue of Standing.</u>

Standing is an issue of federal law. *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 537 (3d Cir. 1994). A party advocating a legal right does not have standing to seek relief based upon the rights of third parties. *Rakas v. Illinois*, 439 U.S. 128, 139 (1978). And so, under Article III standing, the "case and controversy" requirement compels the proponent of a legal right demonstrate: "(1) an 'injury in fact' or 'invasion of a legally protected interest' which is 'concrete and particularized'; (2) a 'causal connection between the injury and conduct'; and (3) a likelihood 'the injury will be redressed by a favorable decision.'" *Decus, Inc. v. Heenan*, 2017 WL 1396044, at *3 (E.D. Pa. 2017) (quoting *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017)).

SEI maintains S&M does not have standing to bring its claims for two reasons: 1) S&M was not a party to the Hovnanian Agreement; and 2) only S&M, Inc. and Segal VII were named Defendants in the state court action. (ECF Docket No. 394-2, at 29-33.) S&M argues SEI is precluded from arguing "irreconcilably inconsistent" positions regarding standing. Specifically, during the Redding Panel arbitration, SEI argued S&M, Inc., Mr. Segal, and the various S&M

LLCs were "legally indistinguishable under the Purchase Agreements." (ECF Docket No. 400, at 31.) The Pennsylvania Superior Court agreed, concluding:

> [S&M, Inc.] is the parent corporation of a number of single purpose limited liability companies created for the development of The Riverview Estates in Forks Township, including Segal and Morel at Forks Township VII, LLC, which was named in the prior dispute, and Segal and Morel at Forks Township II, LLC, Segal and Morel at Forks Township III, LLC, Segal and Morel at Forks Township IV, LLC, which are named in the present dispute . . . Futhermore, Kenneth Segal is an owner and the president of all the aforementioned corporations. Therefore, we find the parties involved in this dispute are in privity with those involved in the prior dispute.

*Id.* at 31-32 (quoting *Strausser Enters. v. Segal & Morel, Inc.*, 154 A.3d 842 (Pa. Super. Ct. 2016).

S&M's Complaint alleges: all rights, interests, and obligations previously held by S&M, Inc. were transferred to the S&M LLCs – Segal and Morel at Forks Township II, III, IV, and IV. But now, SEI contends, because SEI itself did not include all parties in the original state court action, none of the parties have standing in this case. We refuse to accept such a strict argument. SEI's State Court Complaint and *Lis Pendens* directly influenced the KHOV deal and caused injury to all "Segal Sellers," not just the parties named in SEI's state court action. As SEI and Mr. Mellon already admitted, they sought to block the Hovnanian Agreement by filing the State Court Complaint and *Lis Pendens*. Besides, Mr. Segal and the Trust have standing to sue because they were the actual parties to the Hovnanian Agreement. As S&M maintains, "the Pennsylvania Supreme Court has recognized that '[t]here can, of course, be no doubt that a stockholder can maintain an action, where the act of which complaint is made is not only a wrong against the corporation, but is also in violation of duties arising from contract, or otherwise, and owing to him directly.'" (ECF Docket No. 400, at 33) (citing *White v. First Nat'l Bank*, 97 A. 403, 406 (Pa. 1916).

While claims under the Dragonetti Act cannot be maintained by an individual not a party to the underlying suit, an exception applies to indispensable parties that should have been joined in the underlying action. *Long v. Holtry*, 673 F. Supp. 2d 341, 354 (M.D. Pa. 2009). An indispensable party is defined as one "whose rights are so connected with the claims of the litigants that no decree can be made without impairing its rights." *Hart v. O'Malley*, 647 A.2d 542, 549 (Pa. Super. Ct. 1994); *see also Sprague v. Casey*, 550 A.2d 184 (Pa. 1988). And Pennsylvania courts have consistently held "property owners are indispensable parties in lawsuits concerning the owners' property rights." *Id.*; *see also Columbia Gas Transmission Corp. v. Diamond Fuel Co.*, 346 A.2d 788 (Pa. 1975). Given SEI intended to block the Hovnanian deal by filing the state court action – a deal which included Mr. Segal and the Trust's property rights – Mr. Segal and the Trust should have been joined in the state court proceeding as indispensable parties.

Because S&M alleges an Article III injury-in-fact which is concrete and particularized, and because Mr. Segal and the Trust were indispensable parties to the underlying state court action, S&M does not lack standing for any claim.[7]

### 5. SEI is not Entitled to Summary Judgment on Punitive Damages.

Punitive damages are awarded as punishment when the defendant's behavior is "outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Ruehl v. S.N.M. Enterprises, Inc.*, 2015 WL 2374256, at *3 (M.D. Pa. 2015) (quoting *Feld v. Merriam*, 485 A.2d 742, 746–47 (Pa. 1984)). The defendant's conduct must be so outrageous as to amount to "willful, wanton or reckless" behavior. *Id.*; *see also Hutchison v.*

---

[7] This Court does not accept SEI's argument that Mr. Segal and the Trust lacked standing to assert causes of action for Tortious Interference because they did not own the land subject to the purchase agreement with KHOV. (ECF Docket No. 394-2, at 33.) The Redding Panel determined the Hovnanian agreement triggered SEI's right of first refusal. The Redding Panel could not have come to that conclusion unless Mr. Segal and the Trust owned the land and possessed the authority to enter into the Hovnanian agreement in the first place.

*Luddy*, 870 A.2d 766, 770 (Pa. 2005). Importantly, assessing defendant's state of mind is noteworthy as the conduct must be intentional, reckless, or malicious. *Id.* (citing *Feld*, 485 A.2d at 748).

In assessing state of mind and "reckless indifference," Pennsylvania courts look to Section 500 of the Restatement (Second) of Torts. *Id.* (citing *Hutchison*, 870 A.2d at 771). Section 500 of the Restatement (Second) Restatement of Torts applies two different states of mind regarding "reckless indifference": 1) "where the 'actor knows, or has reason to know, . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk'"; and 2) "where the 'actor has such knowledge, or reason to know, of facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so.'" *Id.* (quoting *Martin v. Johns–Manville Corp.*, 494 A.2d 1088, 1098 (Pa. 1985) (quoting Restatement (Second) of Torts § 500, cmt. a)). But, under Pennsylvania law, the first "state of mind" prong in Section 500 is sufficient to create a question for the jury on punitive damages. A claim for punitive damages requires a plaintiff establish: "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act . . . in conscious disregard of that risk." *Hutchison*, 870 A.2d at 772 (citing *Martin*, 494 A.2d at 1097–98).

S&M alleges SEI Defendants acted with reckless indifference when they interfered with S&M's rights under the KHOV agreement. So, S&M sufficiently created a dispute of material fact regarding SEI subjective appreciation of the risk of harm and SEI's conscious disregard of that risk. Specifically, S&M offers:

> (a) the Strausser Defendants did not know anything about the substance of the Hovnanian Agreement and made no effort to contact Plaintiffs or KHOV to

understand the nature of the transaction, but commenced and pursued legal proceedings in an effort to block that transaction anyway; (b) Mr. Strausser admitted that he never carefully reviewed the pertinent contracts before signing the Complaint's Verification, or otherwise made an effort to confirm the allegations advanced within that Complaint; (c) despite knowing that they had a contractual duty to arbitrate, the Strausser Defendants willfully commenced their action in court in order to make their filing publicly known and thereby interfere with the Hovnanian Agreement; (d) the State Court determined that the lis pendens was filed as an inappropriate 'procedural weapon' and that SEI did not pursue its Complaint in good faith; (e) Mr. Edelman testified that Mr. Strausser told him that he wanted to 'get some skin out of Segal and Morel,' which he understood to mean that Mr. Strausser wanted to 'make someone hurt, make someone make sure that they feel the pain than just the mere loss of an asset or some money or something'; and (f) even though their counsel admitted to them that he did not think they would win on appeal—and that the 'only advantage' to pursuing such an appeal was that it would keep a cloud on the title to the Riverview properties—the Strausser Defendants decided to pursue the appeal for this improper purpose anyway.

(ECF Docket No. 400, at 34.) According to SEI, S&M fails to show intentional or reckless conduct given the Redding Panel's award concluding SEI possessed legitimate rights relative to the underlying agreements. This, SEI maintains, satisfies the doctrine of issue preclusion and precludes S&M from litigating these issues which negates any allegation of intentional or reckless conduct.

Given the overwhelming evidence of SEI's state of mind before, during, and after SEI filed the State Court Complaint and *Lis Pendens*, this Court finds that the evidence presented is sufficient to show SEI appreciated the risk of harm and acted in conscious disregard of that risk – two elements required under punitive damages. As this is sufficient to create a question for the jury, the issue of punitive damages will remain.

IV.    **CONCLUSION**

In the accompanying order, this Court denies Defendants' motions for summary judgment. Genuine issues of material fact exist regarding SEI and Mr. Mellon's liability under the Dragonetti Act, Abuse of Process, and Tortious Interference claims.